**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

VIOLET KLETT, individually and as        :
Administratrix on behalf of the          :
Estate of CRYSTAL ROSE KLETT,            :
                                         :
       Plaintiff,                        :
                                         :                Case No. 3:10-cv-02091
     v.                                :
                                         :
STEVEN N. GREEN, NEW                     :                **OPINION**
ENGLAND MOTOR FREIGHT,                   :
JANS LEASING CORPORATION,                :
UNITED PARCEL SERVICE OF                 :
AMERICA, INC. d/b/a UPS, BRYAN           :
WENDELKEN, "JOHN DOE" 1-10,              :
and XYZ UNIDENTIFIED PARTIES,            :
                                         :
       Defendants.                       :
_____:

**WOLFSON, United States District Judge**:

     Defendants United Parcel Service of America ("UPS") and Bryan Wendelken ("Wendelken") (collectively, "UPS Defendants") move for Summary Judgment on Plaintiff Violet Klett's ("Plaintiff" or "Klett") claims for negligence, negligent infliction of emotional distress, and negligent hiring, retention, and supervision.  In this case, Plaintiff alleges that Wendelken, a delivery truck driver of UPS, negligently caused a car accident, injuring Plaintiff and causing the death of Crystal Klett, Plaintiff's daughter.  In that regard, Plaintiff seeks to hold UPS vicariously liable for Wendelken's actions.  Alternatively, the UPS Defendants seek to dismiss Plaintiff's claims based upon her alleged spoliation of evidence, namely, the destruction of the vehicle involved in the crash.  For the reasons set forth below, the UPS Defendants' motion is **GRANTED** with respect to Plaintiff's claim for negligent hiring, retention, and

supervision, and **DENIED** as to all other claims.  Furthermore, the Court finds that there was negligent spoliation of the Klett Vehicle warranting the imposition of sanctions.  Dismissal of the claims against the UPS Defendants is denied and the appropriate form of sanctions will be determined at the time of trial.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 21, 2007, Crystal Klett (the "Deceased") drove a 1997 Plymouth Neon ("Klett vehicle") southbound in the second lane from the right[1] on a four-lane section of the New Jersey Turnpike.  (Compl. ¶ 11; Matier Crash Investigation Report, 1.)  Plaintiff, the Deceased's mother, sat in the passenger seat.  (Klett Dep. 44:14-16.)  At or about 9:15 PM, "an unidentified, white commercial vehicle described as a tractor trailer," collided with the rear bumper of the Klett vehicle.  (Slimowicz Crash Investigation Report, 1; Klett Dep., 55:10-11.)  As a result of the collision, the Klett vehicle began to fishtail into lane three, and then spun toward the right side of the road.  (Matier Motor Vehicle Crash Description, 3.)

Defendant Steven Green ("Green"), who was operating a tractor-trailer on behalf of Defendant New England Motor Freight, traveled in lane two when he saw the Klett vehicle initially fishtail in front of him.  (May 18, 2009 Green Dep. 33:15-19.)  Green also claims to have seen a 48-foot, white tractor trailer just behind the Klett vehicle.  (Id. at 63:3-8; Sep. 27, 2011 Green Dep. at 16:19-22.)  Green could not see any markings on the truck from his point of view.  (May 18, 2009 Green Dep. at 63:5-8.)  Having seen the Klett vehicle fishtailing, Green merged into lane one, pulling in front of a brown UPS tractor pulling two 28-foot battleship grey trailers, all with UPS logos.  (Sep. 27, 2011 Steven Green Dep. at 17:12-22; 25:18-21; 29:4-16.)

---

[1] There were four lanes on the section of the New Jersey Turnpike where the accident took place. Matier Crash Investigation Report, 1. Hereafter, the right-most lane will be referred to as "lane one," the second lane from the right will be referred to as "lane two," the third lane from the right "lane three," and the left-most lane "lane four."

The Klett vehicle continued to spin, until it came to a complete stop in lane one with the driver's side facing oncoming traffic.  (Slimowicz Crash Investigation Report, 2; Klett Dep. 55:11-12.)  Green's tractor trailer impacted the driver's side of the Klett vehicle.  (Id.; Sep. 27, 2011 Green Dep. at 18:5-8.)

When the accident occurred, Wendelken purportedly drove a UPS tractor trailer southbound on the New Jersey Turnpike.  (Nov. 25, 2009 Wendelken Dep. at 6:25-7:1; 7:11.)  The parties disagree in which lane Wendelken drove at the time of the accident; Wendelken claims to have driven in lane one, while Plaintiff suggests Wendelken drove in lane two behind the Klett vehicle.  (Id. at 8:8-10.)  According to Defendants, Wendelken operated a brown tractor pulling a "battleship gray" trailer, both of which bore the UPS logo on the side.  (Aug. 10, 2011 Wendelken Dep. at 12:7-12; Leach Dep. at 54:21-25, 55:1-9.)  Wendelken testified that he drove UPS tractor No. 264688, which pulled UPS trailer No. 316513.  (Wendelken Timecard.)  Trailer No. 316513 is approximately 28 feet in length, and has a "lighter gray" color.  (Leach Dep. at 55:5-11; 59:4-6.)

With respect to the accident, Wendelken claims he observed a car "[spinning] out." (Aug. 10, 2011 Wendelken Dep. at 10:2-3.)  Then, according to Wendelken, about "70 yards in front of" Wendelken, he saw Green's tractor trailer collide with the Klett vehicle.  (Id. at 11:7-11.)  After the impact, Wendelken claims to have driven "around the accident," after which he "pull[ed] around on the shoulder" about 20-30 yards beyond the crash site.  (Id. at 13:1-5, 13:14-16.)

After colliding with the Klett vehicle, Green pulled his vehicle to the shoulder.  (Sep. 27, 2011 Green Dep. at 23:15-24:3.)  Green only saw one other tractor-trailer pull to the shoulder— the tractor-trailer that drove behind the Klett vehicle just before the initial collision. (May 18,

3

2009 Green Dep. at 63:3-8; Sep. 27, 2011 Green Dep. at 16:19-22.)  Similarly, witness and off-duty EMS worker Dennis Glockner ("Glockner") traveled in lane two behind a "truck" when he heard the crash in front of him.  (Glockner Dep. at 22:10-13; 27:8-10.)  Glockner followed that truck as it pulled onto the shoulder.  (Id. at 27:4-7.)  Two other witnesses, Stephen Madelinckas ("Madelinckas") and Iounnis Theofunidis ("Theofunidis"), recall seeing only two tractor trailers on the side of the road.  (Madelinckas Dep. at 13:16-16; Theofunidis Dep. at 34:1-2.)  The parties disagree as to whether Wendelken drove the "white" tractor trailer in dispute.

After giving the police his phone number, Wendelken departed the scene to return to work.  (Id. at 17:12-17)  At 11:14 PM, UPS employee Thomas McClain ("McClain") began a driving shift, operating UPS vehicle No. 264688—the same tractor trailer Wendelken operated. (McClain Aff. at ¶ 5; Timecard of Thomas McClain.)  According to UPS procedures, McClain completed a pre-trip inspection, consisting of a visual check of the truck's chassis and tires. (McClain Aff. at ¶¶ 6-7, 11.)  McClain concluded that the vehicle's condition was satisfactory. (Id. at ¶¶ 15, 17.)

Importantly, no witness, including Plaintiff and Defendants Green and Wendelken, was able to specifically identify the truck that initially made contact with the Klett vehicle.  The lead investigating officer, NJ State Police Trooper James Matier ("Matier") concluded in his report that the unidentified vehicle in question was an "unknown tractor-trailer . . . operated by an unknown driver."  (Matier report at 4-5.)  NJ State Police Trooper Steven Slimowicz ("Slimowicz") also investigated the accident, and concluded that the unknown tractor-trailer was an "unidentified, white commercial vehicle described as a tractor-trailer."  (Slimowicz Dep. at 31.)  Green and Glockner described the trailer of that vehicle as "white", though neither recalls whether it bore any markings.  (May 18, 2009 Green Dep. at 63:3-8; Glockner Dep. at 46:21-23.)

Thus, no one gave a clear description of the "white" tractor trailer allegedly responsible for the initial impact.

At the scene, Slimowicz examined the damage done to the Klett vehicle. (Slimowicz Dep. at 47:3-7.) Slimowicz observed "black tire transfer . . . on the right rear portion of the bumper." (Id. at 47:5-7.) Specifically, Slimowicz found a portion of rubber tire wedged in the bumper. (Id. at 53:11-15.) On that section of tire sidewall, Slimowicz found the letters "s-t-o-n-e." (Id. at 53:11-14.) Slimowicz concluded that the tractor trailer responsible for the initial collision used a Bridgestone tire on the front-left side. (Id. at 53:11-14, 19-21.) Slimowicz found that none of Green's tires were damaged. (Id. at 53:24-25.) Moreover, a sample taken from Green's front-left tire did not match the tire residue on the Klett vehicle. (Id. at 53:22-24.)

Relying on UPS's records, Stuart Leach ("Leach"), an Area Automotive Manager for UPS operating in New Jersey, testified that the last recorded tire change for tractor No. 264688 prior to the accident occurred on May 12, 2006. (Leach Dep. at 6:9-10; 47-48.) Leach referred to the "Equipment Repair History" business record for tractor No. 264688, which describes the change to "Directional Mich." (Equipment Repair History for UPS Tractor No. 264688 at 25.) Leach interpreted "Mich." to mean "Michelin" tires. (Leach Dep. at 48:6-7.) The Repair History only specifies the tire installed by name twice: first, on Mar. 23, 2006, when the rear tires were changed; and second, on May 12, 2006, when the front tires were replaced. (Equipment Repair History for UPS Tractor No. 264688 at 25-26.) Only the May 12, 2006 entry, the last recorded installation of front tires before the accident, specifies the type of tire installed. (Id. at 25.) Plaintiff submits photographs of the tractor, presumably taken years after the collision, which show UPS Tractor No. 264688 equipped with Bridgestone tires.

(Photograph of UPS Tractor No. 264688.)[2]

On September 11, 2008, Plaintiff filed a Complaint on behalf of herself and the Deceased, alleging that the negligence of Green, New England Motor Freight, Jans Leasing, Inc., and fictitious defendants John Does 1-10 and XYZ Corp. caused the accident and injuries in question.  On January 20, 2010, Plaintiff amended her Complaint to include Defendants UPS and Wendelken.  Plaintiff asserts claims of negligence, negligent hiring, retention, and supervision, and negligent infliction of emotional distress.  Following discovery, UPS and Wendelken filed the instant Motion for Summary Judgment.

## II.  STANDARD OF REVIEW

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  See Anderson, 477 U.S. at 252.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the

---

[2] Plaintiff has not identified the date this particular photograph was taken. However, two other photographs of the tractor, also attached to Plaintiff's Opposition, are dated August 10, 2011. Thus, the court presumes these photographs were all taken on the same day.

district court of the basis for its motion." Celotex v. Catrett, 477 U.S. 317, 323 (1986).  The non-moving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading.  Id. at 324; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J. 1994).  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  A mere "scintilla of evidence . . . will be insufficient."  Anderson, 477 U.S. at 252.  Specifically, "while the jury may draw reasonable inferences, it may not be permitted to reach its verdict merely on the basis of speculation or conjecture . . . there must be evidence upon which logically its conclusion may be based."  Community Preschool & Nursery of East Liberty, LLC v. Tri-State Realty, Inc., No. 10-2702, 2011 WL 2198946, at *127 (3d Cir. Jun. 7, 2011) (quoting Fitzpatrick v. Natter, 599 Pa. 465, 485-86 (2008)).

## III. DISCUSSION

Plaintiff's Complaint alleges, in relevant part, that on November 21, 2007, Wendelken negligently "rear-ended" Plaintiff's vehicle, causing Plaintiff to suffer physical, financial, and emotional injury, and causing Plaintiff's daughter's death.  (Compl.  ¶¶ 13-16.)  Plaintiff also contends that UPS, Wendelken's employer, is liable for Wendelken's allegedly negligent conduct on November 21, 2007, and for negligently hiring, retaining, and supervising him. (Compl.  ¶ 42.)  Finally, Plaintiff contends that both Wendelken and UPS, as Wendelken's employer, are liable for the negligent infliction of emotional distress upon Plaintiff, which resulted from witnessing the Deceased's injuries while in the "zone of danger."  (Compl.  ¶¶ 57-61.)  The Court will consider UPS Defendants' motion with respect to each of these claims separately.

### A. Plaintiff's Negligence Claim against Wendelken

The Court first evaluates Plaintiff's negligence claim against Wendelken. [3]  A defendant acts negligently when that defendant breaches a duty owed to a plaintiff, proximately causing the plaintiff's injury.  See Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008) (citing Weinberg v. Dinger, 106 N.J. 469, 484 (1987)).  Here, the parties focus on the identity of the tractor trailer that caused the initial impact. Thus, in short, to withstand the motion for summary judgment, Plaintiff must point to evidence in the record sufficient to show a genuine issue of material fact as to Wendelken's involvement in the initial collision with the Klett vehicle.  See Anderson, 477 U.S. at 252.

### 1.  Witness Testimony

The UPS Defendants argue that no description of the "white" truck from lane two matches that of Wendelken's UPS tractor trailer.  As a result, The UPS Defendants claim Wendelken could not have been responsible.  In contrast, Plaintiff contends that the vehicle responsible for the crash must have been Wendelken's UPS tractor trailer.  Specifically, Plaintiff points to the fact that the "white" tractor trailer pulled to the shoulder in front of Green.  Since Wendelken admits to pulling over, and no witness identified a third tractor trailer on the shoulder that night, Plaintiff argues that the second vehicle was Wendelken's UPS truck.  Both parties rely on the statements of witnesses to support their contentions.  Having reviewed the testimony, the Court finds that Plaintiff has established a genuine issue of material fact with respect to Wendelken's involvement sufficient to withstand summary judgment.

With respect to Green's testimony, he testified that just before the Klett vehicle spun out,

---

[3] UPS does not dispute that Wendelken was acting within the scope of his employment on the night of the accident.  Accordingly, Defendant concedes that "UPS would be vicariously liable for any negligence on the part of Mr. Wendelken" under the theory of *respondeat superior*. (Def. Br. at 24.)

he noticed a "white" tractor trailer situated in front of his truck, but behind the Klett vehicle, in lane two. (May 18, 2009 Green Dep. at 63:3-8; Sep. 27, 2011 Green Dep. at 16:19-22.) According to Green, that "white" vehicle may have initially collided with the Klett vehicle and caused it to spin out.  However, there is no direct evidence identifying the driver of that vehicle.

The UPS Defendants argue that Wendelken's UPS truck does not match the description of the "white" tractor trailer from lane two.  Indeed, Green explained that the "tractor" and "trailer" of that second truck were "white."  (May 18, 2009 Green Dep. at 63:4-5.)  Wendelken claims that he drove a brown tractor with a "battleship gray" trailer, both of which displayed the UPS company emblem.  (Aug. 10, 2011 Wendelken Dep. at 12:7-12; Leach Dep. at 54:21-25, 55:1-9.)  Given that discrepancy, the UPS Defendants contend that with the current record Wendelken could not have been responsible for the collision, particularly since the UPS truck could be identified by its logo.  The Court disagrees.  Plaintiff provided the Court with a picture of a "battleship gray" UPS trailer.  (See Photograph or UPS Trailer dated Aug. 10, 2011.) According to UPS's own technician, Leach testified that all UPS trailers are "battleship gray," which is a lighter shade of gray.  (Leach Dep. at 55:4-11.)  In that regard, it appears from the photograph that a reasonable jury could find that "battleship gray" resembles the color "white," especially at 9:30 PM in mid-November.  In addition, with respect to the identification of the UPS logo, while Green testified that he did not notice any writing on the so-called "white" trailer (see May 18, 2009 Green Dep. at 63:6-8), Theofunidis, an eye witness, testified seeing writing on that "white" trailer, though he could not recall what it said or where on the truck it appeared. (Theofunidis Dep. at 34:1-3; 62:23-25.)

Even more compelling, no witness identified a third tractor trailer on the shoulder after the accident at issue.  Green observed the "white" tractor trailer from lane two "stop[] on the

shoulder about a quarter of a mile ahead of [him]."  (May 18, 2009 Green Dep. at 39:25-40:4.)

Likewise, off-duty EMS worker Glockner also observed a "white" tractor trailer, which was

positioned ahead of him in lane two, pull to the shoulder after the collision. (Glockner Dep. at

27:4-7.)  As far as Green could recall, the only two tractor trailers that pulled to the shoulder

were his and the "white" tractor trailer.  (Sep. 27, 2011 Green Dep. at 23:15-24:3.)  Two other

witnesses, Madelinckas and Theofunidis, corroborate Green's testimony; they only recalled

seeing two tractor trailers parked on the side of the road.  (Madelinckas Dep. at 13:16-16;

Theofunidis Dep. at 34:1-2.)  Significantly, no witness saw a third tractor trailer on the shoulder

after the accident.

Based on the evidence, the two tractor trailers on the side of the road were Green's truck

and the so-called "white" tractor trailer.  However, Wendelken admits to pulling to the side of

the road after the collision (see Aug. 10, 2011 Wendelken Dep. at 13:1-5, 13:14-16).  In that

regard, without any conclusive evidence of the identity of the "white" tractor trailer, there exists

a genuine issue of material fact as to whether Wendelken's vehicle was in fact the "white" tractor

trailer involved in the incident.[4]

Next, the UPS Defendants suggest that Wendelken drove the UPS truck behind Green in

lane one, and thus, could not have caused the accident.  However, Green noted that the UPS

truck from lane one did not pull over after the accident, but rather "kept going."  (Sep. 27, 2011

Green Dep. at 23:10-14.)  As mentioned above, there is no dispute that Wendelken pulled his

tractor trailer over to the shoulder. More significantly, Wendelken's tractor pulled a single, 28-

---

[4] While no witnesses gave a detailed description of the driver of the "white" tractor trailer,
witnesses did observe the mystery driver exit his vehicle on the shoulder following the crash.
Interestingly, there is testimony that this driver stayed on the shoulder for "about a half hour."
(May 18, 2009 Green Dep. at 61:1-2.)  After pulling over, Wendelken admits exiting his vehicle
and staying at the scene for approximately "25 minutes."  (Nov. 25, 2009 Wendelken Dep. at
25:3-5.)

foot-long trailer.  (August 10, 2011 Wendelken Dep. at 12:7-12; Leach Dep. at 54:21-55:9.)  In contrast, according to Green, the UPS truck in lane one pulled "a set of pups," or two 28-foot trailers "hooked together."  (Sep. 27, 2011 Green Dep. at 23:4-9.)  Thus, the description of Wendelken's tractor trailer does not match that of the UPS truck Green identified in lane one.

In sum, the evidence does not resolve the questions of where Wendelken's tractor trailer was before it pulled over to the shoulder, or whether Wendleken's tractor trailer and the "white" truck on the shoulder were one in the same.  Such genuine issues of material fact require a weighing of the evidence, and that task is reserved for a jury.  See, e.g., Boyle Cty. of Allegheny Penn., 139 F.3d 386, 393-94 (3d Cir. 1998).

### 2. Physical Evidence

However, Defendants further argue that physical evidence taken from the Klett vehicle proves that Wendelken was not involved. Trooper Slimowicz recovered a strip of rubber tire from the rear bumper of the Klett vehicle, which bore the letters "s-t-o-n-e." (Slimowicz Dep. at 53:11-14, 19-21.)  From this Slimowicz concluded the truck that first collided with the Klett vehicle had Bridgestone tires installed on the front-left. (Slimowicz Dep. at 53:19-20.)  The Equipment Repair History for Tractor No. 264688 ("Repair History") shows that on May 12, 2006—the last recorded front-tire change before the accident—UPS mechanics installed Michelin tires on Wendelken's tractor.  (Equipment Repair History for Tractor No. 264688 at 25.)  Leach noted that the Repair History does not record another tire change until December 19, 2008, more than one and a half years after the accident.  (Leach Dep. at 47:5-10.)

However, Plaintiff contests the veracity of that document.  Leach acknowledges that repairs can go unrecorded if the mechanic does not submit them.  (Leach Dep. at 63:19-25.) Curiously, of the forty times the tires for Tractor No. 264688 were changed or repaired from

November 9, 2000 to July 6, 2011 the Repair History only specifies the type of tire installed by name on March 23, 2006, and on May 12, 2006—the last recorded front tire change before the accident.  (Equipment Repair History for UPS Tractor No. 264688 at 25-26.)  Only the May 12, 2006 entry describes the tire's brand in the repair description column, specifically.  (Id. at 25.) Moreover, the record does not contain other evidence supporting the UPS Defendants' contention that Wendelken's vehicle could not have had Bridgestone tires on the night of the accident, such as a UPS record showing exclusive use of Michelin tires on UPS vehicles, or proof that the UPS repair station responsible for Wendelken's tractor did not carry Bridgestone tires.  Indeed, photographs taken of Wendelken's tractor after the collision show that UPS Tractor No. 264688 is or has been equipped with Bridgestone tires.  (Photograph of UPS Tractor No. 264688.)  While that does not demonstrate conclusively that Wendelken's tractor used Bridgestone tires on the night of the incident, it does confirm that UPS, at some point, installed Bridgestone tires but did not specify it in the Repair History.  (See Equipment Repair History for Tractor No. 264688.)

Even more troubling, Leach acknowledges that the Repair History contains inaccuracies. (Leach Dep. at 58:1-12.)  Specifically, numerous errors appear on the page recording the last tire change before the accident, which the UPS Defendants contend precludes the possibility that Wendelken was involved in the incident.  First, the document inaccurately reflects the miles traveled from Sep. 6, 2005, to May 16, 2006.  (Equipment Repair History for UPS Tractor No. 264688 at 25-26.)  For example, the document records the mileage of the tractor on May 12, 2006—the date the UPS Defendants cite for the last tire change—as 828,762.  (Id.) However, the Repair History erroneously records the mileage at 746,714 three days later on May 15, 2006. (Id.)  Moreover, while the majority of the Repair History appears in reverse chronological order,

it contains several date-related anomalies.  (See Id.)  For example, an entry from January 18, 2011 appears between entries from May 5 and May 6 of the same year.  (Id. at 1.)  Glaringly, numerous temporal errors such as this appear on the page recording the last tire change before the incident.[5]  (Id. at 25)

On this motion, the Court does not make a finding that the Repair History is necessarily unreliable.  Nonetheless, the document is replete with errors, particularly the page on which the UPS Defendants rely as dispositive evidence that Wendelken did not cause the accident. Purportedly inaccurate documents which are "central to the dispute" raise "a genuine issue of material fact sufficient to defeat a motion for summary judgment."  Local 221-G Bakery v. Quaker Mfg., 108 Fed. Appx. 48, 51 (3d Cir. 2004) (finding a genuine issue of material fact where a contract's typographical error pointed to Paragraph 11, rather than Paragraph 12, for discussion of enhanced severance payments); see also Schweitzer v. Equifax Information Solutions, 441 Fed. Appx. 896, 902-03 (3d Cir. 2011) (finding a genuine issue of material fact where two credit report documents contained "inconsistencies" linking Plaintiff's accounts to bankruptcy proceedings).  The May 12, 2006 tire change entry—the record the UPS Defendants urge absolves Wendelken of liability—is certainly central to the dispute.  Accordingly, Plaintiff is entitled to have a jury weigh the evidence in light of the errors surrounding the May 12, 2006 entry.

The UPS Defendants also point to McClain's vehicle inspection report from the night of the accident, arguing that it proves Wendleken was not involved.  At 11:14 PM the night of the accident, UPS driver McClain reported that UPS Tractor No. 264688 was in "satisfactory"

---

[5] The relevant entries appear on the Repair History, out of chronological order, as follows: 5/12/2006 (the last recorded tire change before the incident); 6/10/2005; 9/26/2004; 5/15/2006; 5/15/2006; 5/12/2006; 4/25/2006; 5/11/2006.  (Equipment Repair History for Tractor No. 264688 at 25.)

condition.  (McClain Aff. at ¶ 12.)  McClain notes that "if [he] had observed accident damage or other safety-related problems," he would have reported them.  (Id. at ¶ 14.)  While these facts certainly go to disprove Wendelken's involvement, they are far from dispositive.  At best, the record indicates that McClain did not observe any damage he thought reportable.

In sum, the evidence available could lead a reasonable jury to conclude that Wendelken's tractor trailer initially collided with the Klett vehicle, causing it to spin out and eventually impact Green's vehicle.  The record shows that only two tractor trailers pulled to the shoulder—Green's, and the tractor trailer behind the Klett vehicle when it began to fishtail.  Wendelken admits to pulling to the shoulder, and no witness reported seeing a third tractor trailer at the scene.  As such, a reasonable jury could find that the "white" tractor trailer was actually Wendelken's UPS truck.  Moreover, disputes between the parties regarding the physical evidence raise additional genuine issues for trial.  Thus, Plaintiff has demonstrated a genuine issue of material fact for trial with regard to Wendelken's negligence.

### 3.  Wendelken's Credibility

Plaintiff also argues that Wendelken offers several contradictory statements in his deposition testimony, which merit review by a jury. Specifically, Plaintiff argues that Wendelken makes contradictory claims regarding to whom Wendelken made phone calls around the time of the accident, how Wendelken came to pull to the shoulder of the road, and to whom Wendelken reported the accident.  However, the Court need not evaluate the credibility of Wendelken's testimony at this time. See Anderson, 477 U.S. at 255 (holding that "credibility determinations . . . are jury functions, not those of a judge.")  That issue is reserved for the fact finder.

**B. Negligent Infliction of Emotional Distress**

Next, the Court will address Plaintiff's claim for negligent infliction of emotional distress against UPS and Wendelken.   As the New Jersey Supreme Court summarized in Portee, a Plaintiff must demonstrate four factors to bring a successful negligent infliction of emotional distress claim: "(1) the defendant's negligence caused the death of, or serious physical injury to, another; (2) the plaintiff shared a marital or intimate, familial relationship with the injured person; (3) the plaintiff had a sensory and contemporaneous observation of the death or injury at the scene; and (4) the plaintiff suffered severe emotional distress." Jablonowska v. Suther, 195 N.J. 91, 103 (2008) (citing Portee v. Jaffee, 84 N.J. 88, 101 (1980)); see also G.D. v. Kenny, 411 N.J. Super. 176, 195 (App. Div. 2009), aff'd, 205 N.J. 275 (2011); Russo v. Nagel, 358 N.J. Super. 254, 269 (App. Div. 2003).

Here, it is undisputed that the Decedent suffered fatal injuries as a result of the accident. (Matier Crash Investigation Report at 2.)   Moreover, it is undisputed that Plaintiff, Crystal Klett's mother, observed her daughter's severe injuries from the passenger seat immediately following the accident.   (May 18, 2009 Klett Dep. at 55:10-56:14.)   Plaintiff has also provided ample evidence to support the emotional distress that followed seeing her daughter's death. Indeed, the only argument the UPS Defendants advance is that Wendelken did not cause the accident, and, as such, UPS cannot be held liable for Plaintiff's emotional distress.   The UPS Defendants do not otherwise contest the sufficiency of Plaintiff's prima facie case of negligent infliction of emotional distress. Because the Court finds summary judgment inappropriate as to Wendelken's negligence, Plaintiff's negligent infliction of emotional distress claim can proceed to trial.

### C. Negligent Hiring, Retention, and Supervision

Plaintiff does not oppose summary judgment as to the negligent hiring, retention, and supervision claim against UPS.  Indeed, when an employer can be held liable under a theory of *respondeat superior*, a Plaintiff cannot sustain a claim for negligent hiring, retention, and supervision.  See Mavrikidis v. Petullo, 153 N.J. 117, 133 (1998) (holding that a negligent hiring claim only survives "when the servant is acting outside the scope of his employment" (internal citations omitted)).  Thus, UPS's motion with respect to that claim is granted.

### E. Spoliation of Evidence

Finally, the UPS Defendants argue that Plaintiff "spoiled" evidence by allowing the vehicle involved in the crash to be destroyed.  As a result, they argue that dismissal of this case is appropriate.

After the accident, the New Jersey State Police impounded Plaintiff's vehicle pending criminal investigation of the incident.  (Aug. 10, 2011 Klett Dep. at 44:25-45:3; Third Party Complaint, Klett v. N.J. State Police, Sep. 3, 2009 at ¶¶ 3-4.)   Accordingly, B&L Towing ("B&L") took the vehicle to its facility from the scene on November 21, 2007.  (Third Party Complaint, Klett v. N.J. State Police, Sep. 3, 2009 at ¶ 3.)  However, after the State Police closed the criminal investigation, they failed to notify Plaintiff that her vehicle was free from impound.  (Aug. 10, 2011 Klett Dep. at 45:8-11.)  Thus, the vehicle remained at B&L from the time of the accident until it was destroyed.  (Id. at 45:12-17.)

B&L sued Plaintiff for $5548.80 associated with the towing and storage of the Klett vehicle.  (Id. at 42:19-21; Third Party Summons, B&L Tire, Inc., t/a B&L Towing v. Klett.)  Plaintiff reached a settlement with B&L, in which she agreed to pay $300, and B&L agreed to withdraw the action with prejudice.  (Stipulation of Settlement, B&L Tire, Inc., t/a B&L Towing

v. Klett, ¶ 1.)  Plaintiff's counsel in the instant case also represented Plaintiff in her dispute with B&L.  (Stipulation of Discontinuance, <u>B&L Tire, Inc., t/a B&L Towing v. Klett</u>.)  At some point thereafter, B&L destroyed the Klett vehicle, though the record does not indicate on what date the destruction occurred.  (Aug. 10, 2011 Klett Dep. at 46:9-11.)

On March 29, 2011, and again on April 1, 2011, the UPS Defendants delivered to Plaintiff Notice of Inspection pursuant to Fed. R. Civ. P. 34.  (Def. Notice of Inspection, Mar. 29, 2011 at ¶ 1; Def. Notice of Inspection, Apr. 1, 2011 at ¶ 1.)  In relevant part, the UPS Defendants sought to examine the Klett vehicle.  (<u>Id.</u>)  However, Plaintiff could not produce the vehicle since it had been "demolished."  (Aug. 10, 2011 Klett Dep. at 46:9-11.)  Plaintiff does not recall transferring title to the vehicle, and no longer pays insurance on it.  (<u>Id.</u> at ¶¶ 45:23-25; 46:1-5.) the UPS Defendants move to sanction Plaintiff for spoliation of evidence, arguing that the destruction of Plaintiff's vehicle irreparably prejudiced the UPS Defendants.  In short, the UPS Defendants argue that Plaintiff's claims should be dismissed with prejudice.

First, the Court must determine whether spoliation has, in fact, occurred.  <u>See</u> <u>Bull v. United Parcel Serv., Inc.</u>, 665 F.3d 68, 74 n.5 (3d Cir. 2012) (drawing a distinction between analysis of spoliation and of spoliation sanctions).  Spoliation is the "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  <u>Medeva Pharma Suisse A.G. v. Roxane Laboratories, Inc.</u>, No. 07-5165, 2011 WL 310697, at *13 (D.N.J. Jan. 28, 2011) (quoting <u>Zubulake v. UBS Warburg</u>, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)).  Spoliation occurs where "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."  <u>Bull</u>, 665 F.3d at 73 (citing <u>Brewer v. Quaker</u>

State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)).

Clearly, there is no dispute here that the Klett vehicle is relevant to the claims or defenses in this case.  Similarly, there are no serious questions that Plaintiff had a duty to preserve the vehicle, since it was central to Plaintiff's claim of negligence.  See Mosaid Techs., Inc. v. Samsung Elec. Am., Inc., 348 F. Supp. 2d 332, 336 (D.N.J. 2004) ("While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation") (quoting Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000)).  Indeed, a party seeking relief for injuries sustained in a motor vehicle collision can certainly be expected to foresee analysis of the vehicle involved.

The Court's inquiry of Plaintiff's control over the vehicle requires more consideration. Plaintiff did not maintain physical control of her car.  After the accident, the New Jersey State Police impounded the Klett vehicle pending criminal investigation.  (Aug. 10, 2011 Klett Dep. at 45:8-11.)  Plaintiff claims not to have heard about the vehicle again until B&L filed suit for towing fees.  (Id. at 45:12-17.)  Thus, the Klett vehicle was not in Plaintiff's physical possession, as it stayed at the B&L Towing facility from the day of the accident until the day it was destroyed.  (Third Party Complaint, Klett v. N.J. State Police, Sep. 3, 2009 at 45:12-17.) However, there is no evidence that Plaintiff relinquished ownership, and thus control, of the vehicle prior to filing suit against UPS and Wendelken.  As a result, the vehicle was under Plaintiff's control, insofar as she had access to and ownership of it.  See Zaloga v. Borough of Moosic, No. 3:10-CV-2604, 2012 WL 1899665, at *2 (M. D. Penn.  2012) ("Control is defined as the legal right to obtain the documents required on demand") (quoting Gerling Int'l Ins. Co. v. Comm'r, 839 F.2d 131, 140 (3d Cir. 1988)).

Having determined that Plaintiff had legal control over the vehicle after the accident, the remainder of the spoliation inquiry focuses on whether Plaintiff actually suppressed or withheld the vehicle.  The UPS Defendants argue that Plaintiff made no effort to preserve the vehicle, despite having already filed a claim against UPS and Wendelken.  Plaintiff responds that she did not destroy the car, nor did she order it destroyed, and thus did not actually suppress the evidence.  While Plaintiff's position may be true, spoliation occurs where a party has either "intentionally *or negligently* breached its duty to preserve potentially discoverable evidence." Kounelis v. Sherrer, 529 F. Supp. 2d 503, 519 (D.N.J. 2008) (emphasis added).  Plaintiff certainly knew the importance of the vehicle for her litigation.  Thus, although Plaintiff did not intentionally destroy the vehicle, there is no evidence that she took any steps to ensure that her vehicle would not be destroyed or otherwise in anticipation of this litigation.   In that regard, the Court finds that Plaintiff, at best, negligently breached her duty to preserve the vehicle for inspection.  Accordingly, the Court finds that the destruction of the Klett vehicle constitutes spoliation, albeit negligently.

The Court must next consider whether the circumstances of Plaintiff's conduct warrant dismissal of her claims, as the UPS Defendants suggest.  It is within this court's discretion to determine whether spoliation sanctions are appropriate.  See Scott, 196 F.R.D. at 248 (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991)); see also Kounelis, 529 F. Supp. 2d at 519 (noting that the Court can impose sanctions "pursuant to the Federal Rules of Civil Procedure and the court's inherent powers").   When considering whether spoliation sanctions are appropriate, the court must consider:

> "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future."

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).   However, "no unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Brewer, 72 F.3d at 334 (citing 29 Am. Jur. 2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.")).

At the outset, the Court notes that dismissal is one of the "most drastic sanctions," and "should only be imposed in the most extraordinary of circumstances." Mosaid Techs., 348 F. Supp. 2d at 335.   In that respect, because the Court has found that Plaintiff, at best, negligently spoiled the evidence, i.e., the Klett Vehicle, dismissal is not appropriate.   Other penalties may be imposed to address sanctionable spoliation.   For example, evidence favorable to Plaintiffs recovered from the vehicle could be suppressed, an adverse inference be given to the jury as to the destruction of the vehicle, or imposition of fines, attorneys' fees, and costs to Plaintiff. See, e.g., U.S. v. Philip Morris USA, Inc., 327 F. Supp. 2d 21, 25 (D.D.C. 2004) (precluding testimony of those witnesses who violated document retention policy); Scott, 196 F.R.D. at 248-50 (considering an adverse inference instruction where it appeared that the party destroyed the evidence "intentionally and not as a matter of routine disposal"); In re Prudential Insurance Co. of Am. Sales Practices Litig., 169 F.R.D. 598, 615-17 (D.N.J. 1997) (imposing fines, attorneys' fees, and costs on a party that deliberately destroyed relevant documents prior to trial).   Given the alternate options available, the Court finds that, if Plaintiff's conduct were worthy of sanctions, lesser penalties than dismissal could remedy the wrongdoing.

Upon weighing Plaintiff's fault and the prejudice suffered by the UPS Defendants, the

Court finds that sanctions are appropriate in this case.  When evaluating the degree of Plaintiff's fault, the Court must consider whether the party "intended to impair the ability of the potential defendant to defend itself."  Schmid, 13 F.3d at 80.  While there is no evidence that Plaintiff intended to prevent the UPS Defendants from accessing the Klett vehicle as evidence, Plaintiff did not take any steps to preserve the Klett Vehicle after initiating this litigation.  This conduct, albeit negligent, demonstrates some degree of fault on Plaintiff's part.  See Mosaid Techs., 348 F. Supp. 2d at 337-38, 338 n.11 (finding that negligent failure to preserve evidence "can be sufficient to give rise to a spoliation inference," but does not support imposing "far more serious" sanctions, such as "dismissal, summary judgment, and exclusion of evidence").  Indeed, the Court need not find that Plaintiff intended to destroy the vehicle in order to impose sanctions. See, e.g., Mosaid Techs., 348 F. Supp. 2d at 338 ("If a party has notice that evidence is relevant to an action, and either proceeds to destroy that evidence or allows it to be destroyed by failing to take reasonable precautions, common sense dictates that the party is more likely to have been threatened by that evidence") (citing Schmid, 13 F.3d at 78); Scott, 196 F.R.D. at 248 (finding that spoliation sanctions might be appropriate, even absent intentional destruction); AMG Nat'l Trust Bank v. Ries, Nos. 06-CV-4337 & 09-CV-3061, 2011 WL 3099629, at *5 (E. D. Penn. Jul. 22, 2011); Centimark Corp. v. Pegnato & Pegnato Roof Mgmt., Inc., No. 05-708, 2008 WL 1995305, at *10 (W. D. Penn. May 6, 2008); Paris Bus. Prods., Inc. v. Genisis Techs., No 07-0260, 2007 WL 3125184, at *3 (D.N.J. Oct. 24, 2007).  Here, Plaintiff's counsel was certainly aware that Plaintiff's vehicle was in the possession of B&L Towing prior to the vehicle's destruction.  Indeed, Plaintiff's counsel represented her in connection with the towing and storing charges being pursued by B&L.  Despite having to appreciate the importance of the Klett Vehicle to this litigation, nonetheless, it appears that neither counsel nor Plaintiff took any steps

to ensure that the vehicle would be available for inspection during discovery. This type of negligent conduct -- especially when Plaintiff was represented by counsel who had already initiated litigation -- warrants sanctions.

In addition, the UPS Defendants have lost access to potential evidence. Accordingly, the Court considers whether the resulting prejudice warrants sanctions. See Schmid, 13 F.3d at 79 (explaining that sanctions should be imposed when necessary "to restore the accuracy of the trial, compensate innocent victims, and punish guilty spoliators") (internal citations omitted). The UPS Defendants argue that, had they been able to inspect the vehicle, they might have uncovered additional forensic evidence. The Court agrees. Without the benefit of the Klett Vehicle, the UPS Defendants cannot ascertain whether there was forensic evidence that may have absolved them of liability. For example, analysis of paint transfer, indentation patterns, physical damage, or mechanical problems may have illuminated how the accident occurred, and which vehicle, if any, first collided with Plaintiff's Neon. These analyses have not been, and can no longer be, conducted by any expert or qualified professional. The Court notes that while police officers conducted examinations of the Klett Vehicle after the fatal accident, those reports cannot substitute for an independent expert's opinion. Accordingly, the prejudice to the UPS Defendants coupled with Plaintiff's negligence support the imposition of sanctions. See, e.g., Schwartz v. Subaru of Am., 851 F. Supp. 191, 192-92 (E. D. Penn. 1994) (finding sanctions appropriate where Plaintiff filed suit against a car manufacturer, but took no steps to prevent the destruction of his vehicle before Defendant could inspect it); see also Hirsch v. General Motors Corp., 266 N.J. Super. 222, 266 (imposing sanctions where Plaintiff sold his vehicle to a salvage company before Defendants could examine it). However, the Court will defer making a determination of the type of sanctions, e.g., adverse inference or fines, until trial.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds that there is a genuine issue of material fact with regard to Plaintiff's claims for negligence and negligent infliction of emotional distress against both Wendelken and UPS, and thus, summary judgment is **DENIED** with respect to those claims.   However, the UPS Defendants' motion with regard to Plaintiff's claim for negligent hiring, retention, and supervision is **GRANTED**.   Furthermore, the Court finds that there was negligent spoliation of the Klett Vehicle warranting the imposition of sanctions. Dismissal of the claims against the UPS Defendants is denied and the appropriate form of sanctions will be determined at the time of trial.  An order will be entered consistent with this Opinion.

Dated:  June 27, 2012                                /s/        Freda L. Wolfson
                                                                   Freda L. Wolfson, U.S.D.J.